1

2

3

4

5

6

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

7

8

9

10

11

12

13

14

15

| | |
|---|---|
| **TERRANCE MOSS**, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>**CLEO AI INC.**,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT** |

16

17

18

19

20

Plaintiff Terrance Moss, a Staff Sergeant in the U.S. Army ("Plaintiff" or "Sgt. Moss"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against Cleo AI Inc. ("Cleo" or "Defendant"), and alleges as follows:

21

## <u>NATURE OF THIS ACTION</u>

22

23

24

25

26

1.      This Complaint seeks to protect active-duty military service members from Cleo's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military

27

28

CLASS ACTION COMPLAINT - 1

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

readiness and is detrimental to service-member retention, morale, household stability, security

clearances, and career advancement. Notably here, Cleo makes no effort to fulfill its duty to

determine whether it is lending to Covered Members or to provide legally mandated protections

for them.

2.    Cleo is in the business of payday lending through an earned wage access

("EWA") product—it makes funds available to its customers, who repay Cleo principal and

finance charges (including expedite fees and subscription charges) on or just after payday. Its

business model entails making high-frequency, short-term, and high-cost loans to consumers

living paycheck to paycheck. Despite advertising its loans as "no interest" and promising no

mandatory fees, in practice, Cleo takes in **triple-digit** finance charges for the loans it issues.

Cleo levies its customers with finance charges high enough to make payday lenders blush, with

a recent study revealing Cleo's loans charge **652% APR** on average. The end result is a

financial product that extracts exorbitant fees from workers, encourages serial usage and

dependance on the costly loans, worsens workers' financial circumstances, and traps them in a

cycle of debt.

3.    Plaintiff, a Staff Sergeant in the U.S. Army, has used Cleo's cash advance product

for years. By virtue of the sky-high fees charged for early access to his salary, Cleo has

extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and

TILA.

4.    Borrowing money that is repaid on payday is not an innovation; it is a loan. As

EWA products have become more popular, the parallels to payday lending are striking. Like

payday loans, EWA products can trap users in a cycle of reborrowing that increases their

financial distress, all in service of generating revenue for predatory lenders. Considering the

substance of the transactions, Defendant's cash advance transactions are in reality consumer

credit.

5.    In violation of the MLA, Defendant uses its cash advance product to saddle

CLASS ACTION COMPLAINT - 2

Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.    Cleo's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury trial; and (4) including a mandatory binding arbitration clause. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

7.    Cleo systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.    Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense ("DoD") report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

9.    Cleo's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Sgt. Moss seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

CLASS ACTION COMPLAINT - 3

1

## PARTIES

2      10.      Plaintiff is an individual, over 18 years of age. At all times relevant, Sgt. Moss

3    was a natural person and resident of Washington. Sgt. Moss has been an active-duty service

4    member in the United States Army since January 2017.

5      11.      Defendant Cleo AI, Inc., is a Delaware corporation with its principal place of

6    business in New York. Cleo has offered and entered into loan agreements with consumers,

7    including Covered Members, since at least 2018, entering into millions of credit transactions.

8

## TOLLING OF THE STATUTE OF LIMITATIONS

9      12.      The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls

10   any and all limitations or repose periods for all active-duty military members, including those

11   similarly situated to Sgt. Moss, until their active-duty service concludes. Specifically, § 3936(a)

12   of the SCRA provides:

13           The period of a servicemember's military service may not be included in
             computing any period limited by law, regulation, or order for the bringing of any
14           action or proceeding in a court, or in any board, bureau, commission, department,
             or other agency of a State (or political subdivision of a State) or the United States
15           by or against the servicemember or the servicemember's heirs, executors,
16           administrators, or assigns.

17

## JURISDICTION AND VENUE

18     13.      Venue is proper in King County because Defendant Cleo coordinated business

19   operations and committed the wrongful acts alleged herein in Washington and in King County.

20     14.      This Court has jurisdiction over Cleo, because it, at all times relevant herein, was

21   qualified to do business and regularly conducted business in Washington.

22     15.      During the relevant period, Defendant Cleo extended thousands of usurious loans

23   to Covered Members (and many thousands more to non-military customers) in Washington and

24   in King County—crediting and debiting bank accounts at Washington banks belonging to

25   Washington consumers with loan proceeds and payoffs for Cleo users. In addition, Cleo

26   directed advertisements to consumers in Washington. In so doing, Cleo purposefully availed

27

28   CLASS ACTION COMPLAINT - 4                                    NELSON BOYD, PLLC
                                                                   601 Union Street, Suite 2600
                                                                   Seattle, WA 98101
                                                                   (206) 971-7601

itself of the privileges and benefits of conducting its business within Washington state.

## LEGAL BACKGROUND

### The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

16.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

17.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

18.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans,

---

[5] Report, *supra* n.1.
[6] *Id.* at 10–11.
[7] *Id.* at 11.
[8] *Id.* at 14. To be sure, EWA providers like Cleo do not collect physical checks from their customers at loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

CLASS ACTION COMPLAINT - 5

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

and 'military loans' via the Internet."[9] Those loans, like Cleo's, "are delivered and collected online through electronic fund transfer."[10]

19.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Cleo's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

---

[9] *Id.* at 15.

[10] *Id.* at 16.

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

CLASS ACTION COMPLAINT - 6

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

20.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

21.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

22.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

23.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and veterans

---

[12] *Id.* at 21–22.
[13] *Id.* at 39.
[14] *Id.* at 41–42.
[15] *Id.* at 46.
[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

CLASS ACTION COMPLAINT - 7

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

24.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

**The Military Lending Act**

25.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

26.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

27.    The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

28.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

29.    The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

---

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

CLASS ACTION COMPLAINT - 8

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

**The Truth in Lending Act**

30.    The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

31.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Cleo offers here. Cleo fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *Id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);

CLASS ACTION COMPLAINT - 9

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

## **FACTS**

### **The Earned Wage Product Market and Cleo**

#### **EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

32.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

33.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

34.    EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

35.    Defendant Cleo is one such fintech company that provides an EWA service, which it calls simply "Cash Advance." The Cleo Cash Advance is marketed as a "perfect loan

CLASS ACTION COMPLAINT - 10

alternative for meeting your short-term financial needs, like covering unexpected expenses or bridging the gap until payday." Cleo represents on its website that its "Cash Advance Service (an Earned Wage access service) enables you to access advances on your anticipated income (each, a 'Cash Advance')."

36.    To repay these loans, users must link their bank account to their Cleo profile and authorize automated debits from their linked external bank account on the scheduled repayment date.

37.    EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

38.    Cleo, like its EWA provider competitors, is generally paid through two types of fees: (1) expedite fees, and (2) mandatory subscription fees.

39.    First, **expedite fees** (referred to by Cleo as "Express Fees") are charged to provide instant access to loan funds. For Cash Advances, Cleo charges between $3.99 and $9.99 (less for smaller loans; more for larger loans). Cleo's app discloses the following fee table breaking down its fees:

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

**Why this fee?**

Cleo uses existing banking systems to send your advance at lightning speed

Higher advances mean higher cost from the bank, so your express fee will go up when you're eligible for more

| Advance | Express Fee |
|---------|-------------|
| $0 - $24 | $3.99 |
| $25 - $29 | $4.99 |
| $30 - $39 | $5.99 |
| $40 - $54 | $6.99 |
| $55 - $74 | $7.99 |
| $75 - $99 | $8.49 |
| $100 - $149 | $8.99 |
| $150+ | $9.99 |

40.    The actual cost to provide customers with instant access to funds is less than $0.05.[18]

41.    The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

42.    Cleo's website, app, and marketing advertise instant or same-day access to hundreds of dollars of cash advances. For example, Cleo advertisements include representations such as:

- "get up to $250 **instantly** on Cleo"

- "$250 SPOT"

- "quick access to funds"

---

[18] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

CLASS ACTION COMPLAINT - 12

- "download Cleo and get up to $250 today"

- "Most [advances] arrive within minutes"

- "When do you need it? Today."

- "Cleo uses existing banking systems to send your advance at lightning speed."

43.    Cleo intentionally advertises its Cash Advance product to consumers with limited or poor credit. Indeed, the home page of Cleo's website includes several drop down lists of links to click under various headings. If a user toggles their mouse over the "CASH ADVANCE" heading, a list drops down that begins with a link titled "FOR POOR CREDIT." Cleo also directs advertising to young consumers struggling with basic financial management and living paycheck-to-paycheck.

44.    In its advertisements for instant cash, Cleo does not include information about the $3.99–$9.99 Express Fees users must pay to receive their loan funds instantly. Instead, users who respond to Cleo's advertising and download the Cleo app are not presented with meaningful, prominent disclosures of the Express Fees until they have already connected their bank account, signed up for a monthly subscription service, and begun the process of requesting a cash advance.

45.    While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, Cleo tells its customers that its free, non-expedited version of an advance will take "3-4 business days" to receive, while the expedited service takes just a few minutes. This delay is problematic for Cleo's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

46.    Indeed, a recent study found that the average loan term for Cleo's Cash Advance loans was only 10.3 days.[19] Consumers who cannot wait ten days to access their wages certainly

---

[19] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").

CLASS ACTION COMPLAINT - 13

1    will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As

2    a result, the vast majority of EWA users pay expedite fees to obtain immediate funds

3    disbursement.[20]

4        47.    Turning to the second type of fee, **subscription charges** are monthly fees Cleo

5    charges its users to apply for Cash Advances.

6        48.    Cleo forces users signing up to its service through its app to agree to a monthly

7    subscription to gain access to Cleo Cash Advances. Below is one of the screens Cleo shows users

8    while signing up for Cash Advances through the app:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    _____

       [20] One recent survey found 79% of EWA users typically paid expedite fees to receive funds
25    faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by
       consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial
26    Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024),
       https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-
27    paycheck-advance-market/.

28    CLASS ACTION COMPLAINT - 14                          NELSON BOYD, PLLC
                                                          601 Union Street, Suite 2600
                                                             Seattle, WA 98101
                                                             (206) 971-7601

1

2

3

4

5

6

7

8

9

10

11

12

13

14

**PLANS**

Find the best plan to get your in-app advance

| Benefits | Grow | Plus | Builder |
|---|---|---|---|
| Cash Advance ⓘ | No cash advance | Up to $250[1] | Up to $500[2] |
| Automated savings ⓘ | ✓ | ✓ | ✓ |
| Credit coaching ⓘ | | ✓ | ✓ |
| Credit Builder Card[3] ⓘ | | | ✓ |
| Get paid early[4] ⓘ | | | ✓ |
| Billed Monthly | $2.99 | $5.99 | $14.99 |

15   49.    Subscription fees are presented to users as mandatory fees that must be paid to use

16 the platform and access Cleo Cash Advances. There is no mechanism available through Cleo's

17 app to sign up for Cleo Cash Advances without agreeing to ($5.99 or $14.99) monthly

18 subscription charges.

19   50.    Cleo's practice of charging such mandatory monthly fees has been criticized and

20 was recently the subject of a Federal Trade Commission ("FTC") enforcement action.[21]

21   51.    Based upon an investigation of Cleo, the FTC alleged "Cleo instituted internal

22 policies that contradict Cleo's advertisements and offers only a miniscule number of its customers

23 cash advances close to the advertised amounts."[22] Upon information and belief, many of Cleo's

24

25

26

---

[21] *Fed. Trade Comm'n v. Cleo AI, Inc.*, No. 1:25-cv-02594-ALC, Compl., ECF No. 1 (S.D.N.Y. Mar. 28, 2025) (hereafter "FTC Compl.").
[22] *Id.* ¶ 29.

27

28   CLASS ACTION COMPLAINT - 15

subscriber customers are not offered a cash advance in *any amount* notwithstanding paying monthly subscription fees.

52.     Cleo notes on its website that its Cash Advance product is "[s]ubject to eligibility" as determined by Cleo, therefore not everyone will qualify for a cash advance. And for those who qualify, the vast majority are offered much less than (1) the $250 max advertised by Cleo for Plus subscribers, (2) and the $500 purportedly available to "Builder" subscribers.

53.     Cleo Cash Advance maximum offers range from $20–$100 for first-time customers and $20–$250 for all others. However, few Cleo subscribers are ever offered amounts anywhere near the top end of these ranges.

54.     When properly viewing EWA products' expedite fees and subscription fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

55.     A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

**Wage-based cash advances that don't request tips**
331%

**Wage-based cash advances that request tips**
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

56.     The APR received by Cleo for its Cash Advance product is similar and often ***much higher***. A recent study of thousands of Cleo Cash Advances revealed an average APR of ***652%***.[23]

---

[23] *Not Free*, *supra* 19, at 10.

CLASS ACTION COMPLAINT - 16

57.    Ironically, Cleo and other industry participants market their products as a low-cost alternative to payday loans.[24] Cleo promotes its product as preferable to, and more consumer friendly than, other short-term lending options.[25]

58.    In truth, Cleo is a wolf in sheep's clothing: extending loans with APRs *exceeding* the exorbitantly-priced payday loan products it claims to replace.

59.    The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[26] For Cleo, fees are impossible to avoid, since users have to pay *at least* a $5.99 monthly subscription to be eligible for a Cash Advance and Cleo makes more money on Express Fees on the vast majority of Cash Advance loans extended to its customers.

60.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

61.    A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[27] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

---

[24] *What is a Cash Advance and How Does It Work?*, CLEO (Apr. 5, 2024) (stating cash advance apps, "such as Cleo" allow users to "save as much money as possible and avoid high interest rates and fees" charged by other short-term lending options, like "credit card companies, payday lenders, and online lenders"), https://web.meetcleo.com/blog/what-is-a-cash-advance-and-how-does-it-work.

[25] *Id.* ("A cash advance is usually a much cheaper alternative to other financial products such as credit cards or personal loans.").

[26] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

[27] *Loan Shark*, *supra* note 26, at 7.

62.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[28]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

63.    While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

64.    Not everyone who creates a Cleo account and pays subscription fees will qualify for a Cash Advance. To be eligible for a Cash Advance, borrowers must meet minimum qualifications set by Cleo.

65.    To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, Cleo requires users to connect their accounts to Cleo through a third-party service called Plaid.[29] Plaid partners with Cleo and other fintech companies to allow them to view data in customers' accounts. Plaid allows Cleo to "[q]uickly verify assets and income" of Cleo users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[30]

66.    Cleo uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits on or immediately after the payday following any given loan, ensuring their loans are paid as soon as funds become available.

67.    Cleo's underwriting process is detailed and considers many factors. Cleo continually adjusts eligibility and maximum withdrawal amounts depending on the individual's

---

[28] *Not Free*, *supra* note 19, at 6.
[29] Users signing up for a Cleo account through the app are shown a screen directing the user to link their bank account.
[30] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).

CLASS ACTION COMPLAINT - 18

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, Cleo's "AI algorithm securely analyzes information from your bank account and determines your eligibility based on a combination of factors like your income, spending, and borrowing patterns."

68.    In addition, Cleo advises users through its app that it considers the following factors when determining eligibility, reproduced verbatim:

- **Repayment history**.

  i.    **What this means**: How much you borrow and whether you repay it on time: this includes advances from both Cleo and other providers.

  ii.    **What you can do**: Repaying each advance on time is a single factor that can improve your chances of securing higher advances in the future.

- **Account balance**.

  i.    **What this means**: This is the how [sic] your account balance varies, not just how much you earn but how low it gets over the month.

  ii.    **What you can do**: Connecting all accounts helps give a realistic full picture, as well as using the budget tab to manage spending.

- **Bank charges**.

  i.    **What this means**: The amount of bank fees you're paying, this includes: ATM withdrawal fees, account fees, overdraft fees and return transactions.

  ii.    **What you can do**: Try and dodge avoidable fees and stay in a positive balance.

- **Pay cycles and income**.

  i.    **What this means**: How much income you usually receive over time, and how long it is until your next estimated payday.

  ii.    **What you can do**: Make sure you're connecting all of your accounts and all your earnings are accounted for.

CLASS ACTION COMPLAINT - 19

- **Spending habits.**

  i. **What this means**: How much you're spending, including how much you spend on certain categories (e.g. entertainment).

  ii. **What you can do**: Set up a budget that gives you room to breathe – live your life but aim to finish each pay cycle with a little more left to spare.

69.     During the relevant period, for many borrowers, Cleo also "perform[ed] a soft credit check to assess [prospective borrowers'] creditworthiness and determine the amount of money [they] are eligible to borrow."[31]

70.     Cleo's underwriting process is both rigorous and continual. Cleo uses algorithms to determine customer eligibility (for any cash advance, and to set limits) constantly, and advises customers who are deemed ineligible to "wait a few days and try again."

71.     Qualifying for a cash advance is by no means guaranteed. Cleo notes that its Cash Advances are offered only to "eligible" subscribers. During the class period, many users who created a Cleo account, provided all the information (including sensitive demographic information and bank account access) requested, *and* signed up to pay and paid subscription fees were deemed by Cleo unqualified for a Cash Advance.

72.     That is, after reviewing borrowers' financials, Cleo determines many of its paying customers are not credit worthy and declines to offer them Cleo Cash Advance access.

73.     For borrowers who qualify, Cleo strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay. Through its constant underwriting process, Cleo extends loans to borrowers only when it is confident they will repay.

---

[31] *What is a Cash Advance and How Does It Work?*, CLEO (Apr. 5, 2024) (stating cash advance apps, "such as Cleo" allow users to "save as much money as possible and avoid high interest rates and fees" charged by other short-term lending options, like "credit card companies, payday lenders, and online lenders"), https://web.meetcleo.com/blog/what-is-a-cash-advance-and-how-does-it-work.

CLASS ACTION COMPLAINT - 20

74.     For qualifying borrowers, Cleo generally begins by offering relatively low amounts of credit: first-time users are eligible for a maximum of $100.00 and repeat users could borrow up to $250.00. But as the FTC discovered in its investigation, "only a miniscule number of [Cleo's] customers [are offered] cash advances close to the advertised amounts."[32]

75.     Borrowers obtain greater access to credit—*i.e.*, Cleo raises their maximum loan limit—by consistently paying off loans to Cleo on time and generally improving their financial health (which Cleo monitors through the borrowers' bank balance, spending behavior, repayment history, and income).

76.     Cleo notably restricts access to its largest loans to a select few of its borrowers who take *extra steps* to qualify themselves and who Cleo deems exceptionally creditworthy. For instance, consumers who sign up for the more expensive "Builder" plan can only *become* eligible for loans up to $500.00 if they take extra steps, including (a) applying and being approved for a Builder Cleo credit card, and (b) setting up a direct deposit from the consumer's payroll to Cleo. Even then, upon information and belief, only a small fraction of consumers who jump through Cleo's hoops qualify for the full $500.00 advance.

77.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[33]

---

[32] FTC Compl., ¶¶ 29–36.

[33] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

CLASS ACTION COMPLAINT - 21

78.    In addition to these loan qualification procedures, borrowers must link their bank account (that receives a consistent source of directly deposited income) to their Cleo profile to ensure seamless repayment.

79.    During the cash advance request process, Cleo prompts users with the question: "When will you pay it back?" and requires users select a payback date within a short window of time.

80.    For many users, Cleo *allows* users to select a payback date, but restricts the selection to either the user's next anticipated payday or the next 1–2 days immediately following that payday.

81.    After the user "Confirm[s] repayment date" in the app, Cleo prompts users to check a box asking if they "Need a backup plan?" Users who check that box permit Cleo to "take up to 3 partial repayments if [the borrower's bank] balance can't cover the full cost of this and future advances."

82.    Regardless of whether a user opts into this "backup plan," Cleo makes users authorize backup collection methods. Specifically, in order to take out an advance, Cleo requires users to check a box agreeing that: "If my primary card fails, Cleo can use my other linked accounts to repay my cash advance, or fees."

83.    To facilitate repeat attempts at collecting repayment, Cleo partners with Stripe, a fintech company that offers a product called "Stripe Payments," which facilitates "direct integrations with card networks and [Stripe's] Adaptive Acceptance feature, which uses machine learning models to optimize and retry declined payments in real time[.]"[34] Stripe boasts that using its product to squeeze Cleo consumers with low balances resulted in a "1.5% increase in

---

[34] *Cleo reduces chargeback rate by 23% with Radar for Fraud Teams*, STRIPE.COM, https://stripe.com/customers/cleo-ai (last visited Apr. 2, 2025).

CLASS ACTION COMPLAINT - 22

successful cash advance repayments," which "means Cleo receives more money from successful payments, while reducing failed transaction costs and increasing overall revenue."[35]

84.     Failure to pay back a Cleo Cash Advance loan results in suspension of the borrower's Cleo until the outstanding balance is paid.

85.     Moreover, until at least late 2023, Cleo did not permit consumers with an outstanding cash advance to cancel their subscriptions through the app.[36] So a consumer with an outstanding cash advance would continue to be charged non-cancellable subscription charges until all cash advances were repaid.

86.     In sum, Cleo's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount sufficient to cover existing obligations *and* a Cleo Cash Advance; (3) link the bank account to which direct deposits are received to Cleo's app through Plaid; (4) authorize Cleo to automatically debit the linked accounts on or around the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; (5) be current on all prior Cash Advance loans; and (6) be current on all Cleo subscription fees. Borrowers who fail to complete these steps cannot obtain cash advances.

87.     Additionally, if a customer is unable to repay a loan, Cleo prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

88.     Through these underwriting procedures and policies, Cleo ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

---

[35] *Id.* Cleo's global head of operations was quoted in the same article as follows: "As a company, we talk about everything in terms of lifetime value, with a dollar value attributed to every user," Carvey said. "Leveraging Stripe for our cash advance business reduces our failure costs by increasing our success rates, resulting in a positive impact on our user lifetime value." *Id.*

[36] FTC Compl., ¶ 45.

CLASS ACTION COMPLAINT - 23

89.     These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[37]

### Cleo's Loans to Plaintiff

90.     Sgt. Moss is currently an active-duty Staff Sergeant in the U.S. Army stationed at Joint Base Lewis-McChord in Washington.

91.     He has been an active duty servicemember since January 2017 and will remain on active duty until at least November 2025.

92.     Cleo extended consumer credit to Plaintiff in the form of Cleo Cash Advance transactions like those discussed above.

93.     Plaintiff used the loans from Cleo for personal, family, or household purposes.

94.     Plaintiff paid Cleo's finance charges, in the form of Express Fees and subscription charges, to obtain cash-advance loans from Cleo.

95.     A small selection of Cleo Cash Advance loans made by Cleo to Plaintiff (and accompanying Express Fees) are shown in the below table, with the cost of credit and APR included:[38]

| Date | Principal Amt. | Instant Delivery Fees | Loan Period | APR |
|---|---|---|---|---|
| 1/4/24–1/31/24 | $20.00 | $3.99 | 27 days | 270% |
| 2/29/24–3/14/24 | $40.00 | $6.99 | 14 days | 456% |
| 8/26/24–9/4/24 | $150.00 | $9.99 | 9 days | 270% |
| 9/4/24–9/19/24 | $150.00 | $9.99 | 15 days | 162% |

---

[37] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

[38] These APR calculations are solely demonstrative and do not include the subscription fees which must be included in the military APR calculation pursuant to 32 C.F.R. § 232.4(c)(1)(iii)(C).

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

96.    Sgt. Moss has received dozens of usurious loans from Cleo since he started using the service. For much of the relevant period, Sgt. Moss took out a loan each pay period and was forced to take out *another loan* immediately after repayment of his last loan.

97.    Sgt. Moss has paid monthly subscription fees throughout the relevant period to be a Cleo Plus subscriber.

98.    The fees attendant to Defendant's loans (including, *inter alia*, Express Fees and subscription charges) are immediately and directly connected to Cleo's extensions of credit to Plaintiff.

99.    Further, Cleo's credit agreement required Sgt. Moss to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

100.    Cleo's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

## Cleo Violates the MLA and the TILA

101.    The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

102.    A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

103.    Sgt. Moss and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR §§ 232.3(g)(2) and (g)(3)).

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

104.   Sgt. Moss is a Covered Member with respect to his loan agreements with Cleo because he took out the loans while an active-duty service member for personal, family or household purposes.

105.   Cleo is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

106.   The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

107.   Cleo violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a Class Action Ban and Waiver of Jury Trial; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. §§ 987(b), (c), (e)(2), (e)(6)–(7).

108.   As a result of Cleo's failure to provide substantially any of the disclosures required by TILA, Cleo also violates 15 U.S.C. § 1638.

## CLASS ACTION ALLEGATIONS

109.   Plaintiff brings this class action on behalf of himself and all other persons similarly situated and the general public. The proposed "MLA Class" and the "TILA Class" (collectively the "Classes") are defined as follows:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Cleo to use its "Cash Advance" (or substantially similar) product, in which Cleo was paid a finance charge (including, without limitation, an express fee or subscription charge).

**TILA Class**: All individuals in the United States that entered into an agreement with Cleo to use its "Cash Advance" (or substantially similar) product, in which

Cleo was paid a finance charge (including, without limitation, an express fee or subscription charge, or tip).

110.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Cleo and any entity in which Cleo has a controlling interest, or which has a controlling interest in Cleo, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

111.    Sgt. Moss reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

## Numerosity and Ascertainability

112.    Plaintiff is unable to state the precise number of members of the classes because such information is in the exclusive control of Cleo. Cleo's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. Cleo has made millions of loans, and Sgt. Moss estimates there are, at least many thousands of consumers in the MLA Class and TILA Class. As a result, Plaintiff believes that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of Cleo.

113.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Cleo's possession, custody, or control.

## Commonality

114.    There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Cleo has caused or could cause

CLASS ACTION COMPLAINT - 27

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Sgt. Moss and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

- Whether Cleo is a "creditor" subject to the protections and limitations of the MLA;

- Whether Cleo's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

- Whether Cleo entered into standard form loan agreements with Covered Members;

- Whether Cleo's loans exceed the MLA statutory rate cap of 36% MAPR;

- Whether Cleo failed to provide required credit disclosures in violation of the MLA;

- Whether Cleo's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

- Whether Cleo's standard form loan agreements contain an arbitration clause in violation of the MLA;

- Whether Cleo failed to provide required credit disclosures in violation of TILA;

- Whether each month Cleo charged interest to Sgt. Moss and Class Members it restarted the statute of limitations under the MLA;

- Whether each month that Sgt. Moss and the Class Members paid money to Cleo it restarted the statute of limitations under the MLA;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether Cleo should be enjoined from continuing its lending practices in the manner challenged herein;

CLASS ACTION COMPLAINT - 28

- Whether Cleo is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Sgt. Moss and the Class are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

**Typicality**

115.    The claims and defenses of Sgt. Moss are typical of the claims and defenses of the MLA Class because Sgt. Moss is a Covered Member and loan agreements with Cleo are typical of the type of personal, household, or family loans that Cleo normally provides to Covered Members. Additionally, Cleo uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Sgt. Moss are typical of the claims and defenses of the TILA Class. Sgt. Moss suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Classes.

**Adequate Representation**

116.    Sgt. Moss will fairly and adequately assert and protect the interests of the Classes. Sgt. Moss has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Sgt. Moss has no conflict of interest that will interfere with maintenance of this class action.

117.    Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

118.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient

CLASS ACTION COMPLAINT - 29

method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

119.   The proposed Classes fulfill the certification criteria of Civil Rule 23.

## **FIRST CAUSE OF ACTION**

**(Violations of the Miliary Lending Act, 10 U.S.C. § 987, *et seq.*)**
**(On Behalf of Plaintiff and the MLA Class against Defendant Cleo)**

120.   Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–119 above.

121.   The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

122.   A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

CLASS ACTION COMPLAINT - 30

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

123.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

124.    Sgt. Moss and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

125.    Sgt. Moss is considered a "Covered Member" with respect to his Cleo loan agreements because Sgt. Moss is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

126.    Cleo is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

127.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

128.    Cleo charged Sgt. Moss and the MLA Class well above the 36% interest rate cap on their loans, in violation of the MLA.

129.    Cleo fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

130.    Cleo's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

CLASS ACTION COMPLAINT - 31

131.   Cleo's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

132.   As a result, Cleo violates 10 U.S.C. § 987.

133.   Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

134.   Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.*)
### (On Behalf of Plaintiff and the TILA Class against Defendant Cleo)

135.   Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–119 above.

136.   TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Cleo's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

137.   Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

138.    Cleo is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

139.    Cleo has not provided such disclosures before consummation of the loan agreements.

140.    Cleo failed to provide such disclosures to Sgt. Moss and the TILA Class.

141.    As a result, Cleo violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

142.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiff seeks an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of the Classes, Plaintiff prays for judgment against Cleo as follows:

a.    That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b.    That the Court enter judgment against Cleo and in favor of Plaintiff and the Classes on all counts;

c.    That the Court find and declare that that Sgt. Moss and MLA Class Members' standard form loan agreements violate the MLA;

d.    That the Court find and declare that Cleo violated the MLA and award Sgt. Moss and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e.    That the Court award Sgt. Moss and MLA Class Members punitive damages

CLASS ACTION COMPLAINT - 33

NELSON BOYD, PLLC
601 Union Street, Suite 2600
Seattle, WA 98101
(206) 971-7601

1    pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

2    f.   That the Court find and declare that Cleo violated TILA and award Sgt. Moss and

3         the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. §

4         1640;

5    g.   That the Court enjoin Cleo from continuing to engage in predatory lending

6         practices in violation of the MLA and TILA;

7    h.   That Cleo be required by this Court's Order to compensate Plaintiff's counsel for

8         their attorneys' fees and costs of suit, and that Cleo be ordered to bear the cost of

9         notice to the absent class members, as well as the administration of any common

10        fund;

11   i.   That the Court award interest as allowable by law;

12   j.   That the Court award reasonable attorneys' fees as provided by applicable law,

13        including *inter alia* under the MILA, the TILA;

14   k.   That the Court award all costs of suit; and

15   l.   That the Court award such other and further relief as the Court may deem just and

16        proper.

17   Dated:  April 10, 2025            Respectfully submitted,

18

19                                     s/ Deborah M. Nelson
                                       Deborah M. Nelson, WSBA #23087
20                                     nelson@nelsonboydlaw.com

21                                     s/ Jeffrey D. Boyd
                                       Jeffrey D. Boyd, WSBA #41620
22                                     boyd@nelsonboydlaw.com

23                                     NELSON BOYD, PLLC
24                                     601 Union Street, Suite 2600
                                       Seattle, Washington 98101
25                                     Phone: (206) 971-7601

26

27
     CLASS ACTION COMPLAINT - 34                          NELSON BOYD, PLLC
28                                                       601 Union Street, Suite 2600
                                                            Seattle, WA 98101
                                                            (206) 971-7601

1

_s/ Randall K. Pulliam_
Randall K. Pulliam (*pro hac vice pending*)
rpulliam@cbplaw.com

2

CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400

3

Little Rock, AR 72207
Phone: (501) 312-8500

4

5

_s/ Joshua Jacobson_
Joshua Jacobson (*pro hac vice pending*)

6

joshua@jacobsonphillips.com
JACOBSON PHILLIPS, PLLC

7

2277 Lee Road, Ste. B
Winter Park, FL 32789

8

Phone: (321) 447-6461

9

ATTORNEYS FOR PLAINTIFFS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CLASS ACTION COMPLAINT - 35

28