UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TERRANCE MOSS,<br><br>                Plaintiff,<br><br>    v.<br><br>CLEO AI INC.,<br><br>                Defendant. | Case No. C25-879-MLP<br><br>ORDER |

## I.    INTRODUCTION

Defendant Cleo AI Inc. ("Cleo") has moved to dismiss class claims and stay individual claims in favor of arbitration, or for alternative relief. (Mot. (dkt. # 26).) Plaintiff Staff Sergeant Terrance Moss ("Sgt. Moss") opposes the motion (Resp. (dkt. # 30)), and Cleo has replied (Reply (dkt. # 34)). The Court heard oral argument on August 20, 2025. (Dkt. # 45.) Having considered the parties' briefing, the arguments presented at oral argument, the governing law, and the balance of the record, the Court DENIES Defendant's Motion to Dismiss. (Dkt. # 26.)

ORDER - 1

## II. FACTUAL BACKGROUND[1]

Cleo, a financial technology company, offers an Earned Wage Access ("EWA") product marketed as "Cash Advances" through its smartphone application ("Cleo App"). (Compl. (dkt. # 1-2), ¶¶ 33-35, 42, 44.) Cleo presents these Cash Advances as an alternative to traditional loans, designed to address users' short-term financial needs, such as unexpected expenses or bridging the gap until their next payday. (*Id.*, ¶ 35.) Cleo's website describes the service as providing "access [to] advances on [users'] anticipated income." (*Id.*)

Cleo promotes its Cash Advances as having "no interest" and no mandatory fees, positioning them as a cheaper alternative to conventional loans. (Compl., ¶¶ 2, 57.) Cleo targets consumers with limited or poor credit, promising same-day access to funds, often up to $250. (*Id.*, ¶¶ 42-43.) Its marketing materials emphasize speed and accessibility, featuring phrases like "get up to $250 instantly," "quick access to funds," and "Most [advances] arrive within minutes," and highlighting a "FOR POOR CREDIT" option. (*Id.*)

To access Cleo's Cash Advance service through the Cleo App, users must meet several requirements: (1) pay a monthly Subscription Fee ranging from $5.99 to $14.99; (2) link their bank accounts to the Cleo App; and (3) satisfy Cleo's underwriting criteria. (Compl., ¶¶ 44-49, 64-78.) Advance amounts are typically limited for first-time users to between $20 and $100, with subsequent advances potentially reaching between $20 and $250. (*Id.*, ¶ 53.) Cleo offers two versions of its Cash Advance: a free, non-expedited version that takes "3-4 business days" to receive, and an expedited version that delivers funds in minutes. (*Id.*, ¶ 45.) The expedited version incurs an additional "Express Fee" ranging from $3.99 to $9.99. (*Id.*, ¶ 44.) Users are not

---

[1] In ruling on a Rule 12(b)(6) motion, the Court must accept all material allegations as true and construe the complaint in the light most favorable to the non-movant. *Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

presented with prominent disclosures regarding these Express Fees until after they have connected their bank account, subscribed to a monthly service, and initiated the cash advance request process. (*Id.*)

When requesting a Cash Advance, the Cleo App requires users to select a repayment date, generally coinciding with their next payday or shortly thereafter. (Compl., ¶¶ 79-80.) Users are prompted to authorize Cleo to automatically debit their linked bank accounts for repayment, with the potential for up to three partial repayment attempts. (*Id.*, ¶¶ 81-82.) Users also agree to allow Cleo to access funds from other linked accounts if the primary account lacks sufficient funds. (*Id.*) Cleo utilizes machine learning to optimize repayment processes, integrating directly with users' card networks. (*Id.*, ¶ 83.) Failure to repay results in the suspension of the user's account. (*Id.*, ¶ 84.) Until late 2023, users with outstanding advances were allegedly unable to cancel their subscriptions through the app, resulting in continued subscription fees even without access to further advances. (*Id.*, ¶ 85.)

Sgt. Moss characterizes Cleo's practices as deceptive, likening them to "a wolf in sheep's clothing," offering loans with "triple-digit finance charges" and APRs exceeding those of traditional payday loans. (Compl., ¶¶ 2, 58; *see also id.*, ¶ 95 (*e.g.*, a $20.00 advance with a $3.99 express fee and a 27-day repayment schedule yielding a 270% APR, and a $40.00 advance with a $6.99 express fee and a 14-day repayment schedule resulting in a 456% APR).) Sgt. Moss alleges that Cleo traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and results in an increasing reliance on emergency funds, despite marketing its services as low cost. (*Id.*, ¶¶ 57-60.) Sgt. Moss states he "took out a loan each pay period for much of the relevant period and was forced to take out another loan immediately after repayment of his last loan." (*Id.*, ¶ 96.) He paid monthly Subscription Fees throughout this time.

1  (*Id.*, ¶ 97.) As a result, he alleges unknowingly paying fees corresponding to APRs from 162% to
2  456% (excluding subscription fees) during the relevant period. (*Id.*, ¶ 95.) He notes a recent
3  study of Cleo's Cash Advances revealed an average APR of 652%. (*Id.*, ¶ 56.)

4  Based on these allegations, Sgt. Moss brings a putative class action, alleging Cleo's Cash
5  Advances and related fees violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"),
6  and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA").

### III. LEGAL STANDARD

Motions to dismiss under Fed. R. Civ. P. 12(b)(6) may be based on "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation omitted). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (citation omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### IV. ANALYSIS

Cleo seeks to compel arbitration or dismiss the case, arguing that: (1) its lending agreement delegates arbitrability to an arbitrator; (2) the arbitration agreement is valid; and (3)

ORDER - 4

its Cash Advances are not "credit" nor subject to "finance charges" under the MLA and TILA. (Mot. at 15-31.) The Court will address each argument in turn.

### A. The MLA Applies, Barring Arbitration

The central issue is whether the MLA applies, which would preclude arbitration. The MLA explicitly states that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4). This provision reflects a clear congressional directive that overrides the Federal Arbitration Act ("FAA") and protects servicemembers' rights to seek judicial relief. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 514 (2018) ("Congress has . . . shown that it knows how to override the Arbitration Act when it wishes—by explaining, for example, that . . . requiring a party to arbitrate is 'unlawful' [], 10 U.S.C. § 987(e)(3)."). As the Eleventh Circuit persuasively found, "[i]f the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute." *Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1344 (11th Cir. 2024).

Cleo contends that the parties delegated the question of the agreement's validity and enforceability to an arbitrator through an "additional, antecedent" agreement. Cleo argues that because the delegation clause concerns only arbitration involving issues of arbitrability—not the extension of consumer credit—the MLA cannot challenge the delegation clause as a severable contract. (Mot. at 18-19; Reply at 14-15.) "Because the MLA plainly overrides the FAA, [however,] the delegation clause cannot be enforced." *Steines*, 113 F.4th at 1345.

### B. Cash Advances Constitute Credit

The next issue is whether Cleo's Cash Advances constitute "credit" under the MLA and TILA. The MLA protects servicemembers by capping the annual percentage rate at 36% on

ORDER - 5

"consumer credit." 10 U.S.C. § 987(b). The MLA incorporates TILA's definition of "consumer credit," "except that such term does not include (A) a residential mortgage, or (B) a loan . . . offered for the express purpose of financing the purchase [of a car or other personal property,] and [that] is secured by the car or personal property procured." 10 U.S.C. § 987(i)(6). The MLA also incorporates TILA's definition of "annual percentage rate," encompassing "all fees and charges" associated with a credit transaction. 10 U.S.C. § 987(i)(4). In turn, TILA defines "credit" as the right "to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). Regulation Z, which implements TILA, clarifies that "credit" includes cash advances provided in exchange for the consumer's authorization to debit their deposit account at a later date. 12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit, ¶ 2 ("Payday loans; deferred presentment"). Cleo's Cash Advances involve the precise type of deferred presentment scheme that Regulation Z characterizes as credit.

      Cleo requires users to select a repayment date during the Cash Advance request process, prompts them to authorize access to other linked accounts for repayment if the primary bank account withdrawal fails, and employs machine learning models to optimize and retry declined payments in real-time. (Compl., ¶¶ 79-83.) Despite these measures, Cleo avers that "consumer credit" requires a pre-existing legal obligation to repay and argues that because it "has no contractual or legal claim against [a Cleo customer] based on a failure to repay an advance[,]" its Cash Advance product does not constitute "consumer credit." (Reply at 7-8.) In support, it cites the dictionary definition of "obligated" as "to bind legally or morally." (*Id.*) The relevant statutory definitions of "debt," however, do not mandate such a formalistic requirement. 15 U.S.C. § 1692a (defining "debt" broadly as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services

ORDER - 6

which are the subject of the transaction are primarily for personal, family, or household purposes"). Cleo's reliance on a dictionary definition of "obligated," while ignoring the applicable statutory definition of "debt" or "credit," undermines its argument.

Accepting Cleo's narrow interpretation would improperly introduce a legal requirement where Congress and regulators have not. It would also disregard Regulation Z and undermine TILA's consumer protection purpose. Courts must liberally construe TILA to protect consumers and "look[ ] past the form of the transactions to their economic substance." *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993); *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982) ("Congress was aware that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish.").

Cleo relies on *Olson v. Unison Agreement Corp.*, 2023 WL 5609251, at *4 (W.D. Wash. Aug. 30, 2023), arguing that the mere advance of funds and expectation of repayment is insufficient to create debt. (Mot. at 23-24.) *Olson* has since been reversed by the Ninth Circuit. The Ninth Circuit explicitly found that a "consumer credit obligation" does not require a legal obligation for repayment, thereby precluding Cleo's argument. *Olson v. Unison Agreement Corp.*, 2025 WL 2254522, at *3 (9th Cir. Aug. 7, 2025).

Cleo attempts to analogize its Cash Advance product to a charitable campaign securing authorization to withdraw monthly pledges. (Mot. at 23-24.) This comparison is unpersuasive, for obvious reasons. Unlike a charitable campaign, Cleo provides a service with the clear expectation of repayment, and the mandatory debit authorization is a key component of this expectation. While Cleo disclaims a formal legal right to repayment, its actual practices suggest otherwise. As the court recognized in *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025), a materially identical product "squarely falls within the definition of credit under TILA,"

ORDER - 7

despite the lender's disavowal of a legal obligation. *Id.* at 935. The *Orubo* court emphasized the economic substance of the transaction, finding "borrowers can only obtain advances after [defendant] takes thorough steps to ensure repayment. In fact, the circumstances under which repayment would not occur are extremely narrow[.]" *Id.* at 933. This Court reaches the same conclusion.

In sum, Sgt. Moss plausibly alleges that Cleo's Cash Advances constitute "consumer credit" as defined by TILA and, as alleged, are offered with a clear expectation of repayment. Cleo fails to present any persuasive or controlling authority to the contrary. At this stage, Sgt. Moss sufficiently pleads that Cleo provides funds to users with a clear expectation—and near certain reality—of recouping them from their linked bank accounts upon receipt of their paychecks. *See Orubo*, 780 F. Supp. 3d at 935; *Johnson v. Activehours, Inc.*, 2025 WL 2299425, at *4 (D. Md. Aug. 8, 2025) (citing *Orubo* with approval and reaching the same conclusion in a case involving a similar EWA product).

### C. Express Fees are Finance Charges

The Court now addresses whether Cleo's Express Fees constitute "finance charges." Cleo argues they do not, because they are not imposed "incident to" or as a "condition of" the extension of credit. (Mot. at 26-28; Reply at 10-13.) This argument is unpersuasive.

The MLA defines "finance charge" by reference to TILA, which provides that the finance charge in "any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). A charge need not be mandatory to be "incident to the extension of credit" and qualify as a "finance charge" under TILA. *See Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 240-41 (2004)

ORDER - 8

(explaining that TILA requires "some necessary connection" between a fee and the extension of credit). A connection between the charge and the extension of credit is therefore sufficient.

Even if "incident to" meant mandatory, Sgt. Moss pleads facts showing that Cleo's Express Fees are effectively mandatory. While nominally optional, they are intertwined with the Cash Advance product. Cleo advertises instant access to cash, and the app design makes avoiding the Express Fee difficult. (Compl., ¶¶ 39-45.) Moreover, as the *Orubo* court recognized, "the time at which funds are received is a material term of credit." 780 F. Supp. 3d at 938. By charging a fee for immediate access, Cleo imposes a finance charge "incident to" the extension of credit.

Cleo directs the Court to *Golubiewski v. Activehours, Inc.*, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024). (Reply at 8, 11-12.) After plaintiffs in that case drew the court's attention to *Orubo*, however, the court acknowledged that "a charge need not be mandatory to be 'incident to the extension of credit' and thus constitute a 'finance charge' under TILA." *Golubiewski v. Activehours, Inc.*, 2025 WL 2484192, at *6 (M.D. Pa. Aug. 28, 2025) (citing *Pfennig*, 541 U.S. at 240-41 and *Orubo*, 780 F. Supp. 3d at 937). Following a "deeper review of the law," the court agreed with *Orubo* that the key requirement is "a connection between the imposition of the charge and the extension of credit." *Id.* Since plaintiffs alleged that defendants made obtaining credit without paying optional fees difficult, the court vacated its original decision and found these charges were "incident to the extension of credit." *Id.*

**D.  Subscription Fees are Finance Charges**

The Court now turns to the issue of subscription fees. Cleo argues that these fees are participation fees, not finance charges, because it "charges a Subscription Fee regardless of whether users take Cash Advances." (Mot. at 28-30.) Cleo also contends that Sgt. Moss waived

ORDER - 9

opposition to this argument. (Reply at 13.) The Court, however, finds that Sgt. Moss sufficiently addressed this issue by asserting the subscription fees are a condition of obtaining cash advances. (Resp. at 23 n. 16; *see also* Compl., ¶¶ 48-49.) The Court concludes that Sgt. Moss adequately pleads facts establishing that Cleo's Subscription Fees are finance charges, rather than participation fees, because without the subscription Sgt. Moss could not obtain a Cash Advance.

### E.     Severability of TILA Claim

Finally, the Court addresses the severability of the TILA claim. Cleo relies on *Espin v. Citibank, N.A.*, 126 F.4th 1010, 1016-19 (4th Cir. 2025), arguing that even if Sgt. Moss's MLA claim is insulated from arbitration, his TILA claim remains subject to it. (Mot. at 30-31; Reply at 16-17.) In *Espin*, the Fourth Circuit addressed claims under the Servicemember Civil Relief Act ("SCRA"), the MLA, the TILA, and the Credit CARD Act. 126 F.4th at 1013-14. The court reversed the denial of a motion to compel arbitration, instructing the lower court to compel arbitration for the SCRA claims and all claims except those under the MLA, as plaintiffs' only basis for avoiding arbitration of the non-MLA claims was tied to the SCRA. *Id.* at 1019.

*Espin* is readily distinguishable from the present case. Here, Sgt. Moss's TILA claim arises from the same factual nucleus as his MLA claim. "If the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute." *Steines*, 113 F.4th at 1344. Because Sgt. Moss's TILA claim is inextricably linked to the same set of facts as his MLA claim, it is also subject to this MLA-created exception to the FAA's mandate favoring arbitration.

### V.     CONCLUSION

For the foregoing reasons, Cleo's Motion to Dismiss (dkt. # 26) is DENIED.

ORDER - 10

With respect to the Court's stay of discovery (dkt. # 44), the parties are directed to meet and confer regarding a trial date and other pre-trial deadlines and shall submit a joint status report with proposed new deadlines to the Court for its consideration by **September 29, 2025**.

Dated this <u>8th</u> day of September, 2025.

MICHELLE L. PETERSON
United States Magistrate Judge

ORDER - 11